# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

UNITED STATES OF AMERICA,          )
                                   )
                 Plaintiff,        ) CASE NO. CR15-00181MJP
                                   )
v.                                 ) SEATTLE, WASHINGTON
                                   ) September 1, 2016
GREGORY LYLE BRIDGES,              )
                                   ) SENTENCING
                 Defendant.        )
                                   )
_____

## VERBATIM REPORT OF PROCEEDINGS
### BEFORE THE HONORABLE MARSHA J. PECHMAN
### UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

For the Plaintiff:      CECELIA YOUNGBERG GREGSON
                        J. TATE LONDON
                        United States Attorney's Office
                        700 Stewart Street, Suite 5220
                        Seattle, WA 98101

For the Defendant:      PAGE A. PATE
                        The Pate Law Firm, LLC
                        101 Marietta Street, Suite 3300
                        Atlanta, GA 30303

                        MICHAEL CRAIG NANCE
                        1001 Fourth Avenue, Suite 3200
                        Seattle, WA 98154


Reported by:            NANCY L. BAUER, CCR, RPR
                        Federal Court Reporter
                        700 Stewart Street, Suite 17205
                        Seattle, WA 98101
                        (206) 370-8506

September 1, 2016                                   10:45 a.m.
                          PROCEEDINGS
        _____

           THE CLERK:  This is the matter of United States of
America v. Gregory Lyle Bridges, Cause No. CR15-181.

      Counsel, please make your appearances for the record.

           MS. GREGSON:  Good morning, Your Honor.  Cecelia
Gregson and Tate London for the government.

           THE COURT:  Good morning.

           MR. PATE:  Good morning, Your Honor.  Page Pate and
Michael Nance on behalf of the government.

           THE COURT:  Good morning.

           THE PROBATION OFFICER:  Good morning, Your Honor.
Tom Fitzgerald on behalf of Pretrial/Probation.

           THE COURT:  Good morning, Mr. Bridges.

           THE DEFENDANT:  Good morning.

           THE COURT:  I'd like to review with you what it is I
have read in order to be prepared to hear you this morning.

      First of all, I have reviewed the plea agreement.  I have
also reviewed the release status report that was written
about Mr. Bridges by the Pretrial Services officers.  I have
read the defendant's sentencing memorandum, which comes with
numerous letters of support from friends and family.  I have
read the presentence investigation report that was prepared
by Mr. Fitzgerald, and I have read the government's
sentencing memorandum.

I also received several packets of information from various victims of the pornography -- child pornography here. But, honestly, I can't tell which of these packets is associated with which of the individuals in these particular thousands of images. So if you intend to have me order restitution on those, you're going to have to establish that these requests are part of the content of the defendant's collection.

Did I make myself clear on that?

MS. GREGSON:  Yes, Your Honor.

THE COURT:  Okay.

Is there anything else I should have reviewed in order to be prepared to hear you this morning?

MR. PATE:  Your Honor, you did mention receiving our sentencing memorandum.  There was an attachment and evaluation from Dr. Whitehill.  Did the court review that as well?

THE COURT:  I did review that.  That came in yesterday.

MR. PATE:  Thank you, Your Honor.

THE COURT:  Okay.  Anything else from the government?

MS. GREGSON:  I would like to confirm that the court received the letter from our victim's grandmother.  It was submitted, I believe, yesterday.

THE COURT:  Yes, I saw that as well.

1          MS. GREGSON:  Thank you.

2          THE COURT:  All right.

3      Mr. Bridges, have you had an opportunity to review the

4  presentence report that was written about you?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  And did you have a chance to talk with

7  your counsel about that report?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  And were they able to answer your

10  questions about the report and about the sentencing process?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  Are you ready this morning to go forward

13  with the sentencing?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  Okay.  Thank you.

16      Government's position, please?

17          MS. GREGSON:  The government is prepared to proceed

18  this morning.

19          THE COURT:  Go ahead.

20          MS. GREGSON:  Would the court like us to address the

21  guideline objections that were addressed by counsel?

22          THE COURT:  I'd like you to address anything you

23  think is necessary.

24          MS. GREGSON:  All right.

25      There appears to be one major guideline area that the

1    parties do not agree on.  Fortunately, the government and

2    U.S. Probation are on the same page, Your Honor.

3        That has to do with the objection to 2G1.3(b)(4), which

4    involves commission of a sex act or sexual contact, and can

5    incur two additional points being added to the guideline

6    calculations.

7        It has come to our attention that, essentially, the

8    defense is including an extra element, ultimately, in this

9    calculation, and that would be that the offense has to be --

10   it involves a sex act or he was convicted of a crime

11   involving a commercial sex act.

12       And for some reason the defense has indicated that the

13   defendant must be convicted under 18 U.S.C. 1591(b)(1), which

14   is actually a crime that involves sex trafficking.

15       And nowhere in the analysis or the plain language of

16   2G1.3(b)(4) does it say that such conviction must be under

17   trafficking of children by force, fraud, or coercion.

18       Moreover, going through the application notes, trying to

19   determine where this argument could have come from, the

20   government did follow the application notes that suggest

21   sexual acts have the meaning given under 18 U.S.C. 2246(2),

22   and going to that statute, it defines "sexual act" as contact

23   between -- in this case factually relevant -- penis and anus

24   or penis and mouth, and any contact, however slight, is

25   sufficient.  It also contemplates contact between penis and

1   mouth.

2      So just looking at the plain language of the application

3   notes, I believe defense counsel has mistakenly read an

4   additional crime, or an exclusionary crime, into the statute

5   of 18 U.S.C. 1591(e)(1), which we believe that the additional

6   two points apply to the guideline calculation, and I'd ask

7   the court to find so.

8      There also is a defense objection to the multiple-count

9   adjustment of plus three.  I did confer with U.S. Probation

10   on both of these points prior to coming to court today, of

11   course, and in reviewing the combined offense level

12   calculation, I do concur with U.S. Probation that the number

13   three should be added -- three levels, three units, if you

14   will -- to the defendant's four under 3D1.4.  And I believe

15   that the government -- both probation and the U.S. Attorney's

16   Office has properly calculated the defendant's score.

17      Ultimately, I am respectfully requesting that Your Honor

18   impose ten years' imprisonment for Mr. Bridges.  I am asking

19   for lifetime supervision.  I'm asking for restitution for the

20   two series' individuals or groups that did so request.  They

21   have agreed to the amount of $5,000 each, for a total of

22   $10,000.

23      There is one individual, who is a victim of the SpongeB

24   series, who presented his own letter.  And then there are a

25   series of letters that have been recently written or

provided, because they have been historically written over time by the children who comprised the J_Blond series.

I did my very best to pin down and coordinate the children who were affected from both of those series. I believe that $10,000 will be sufficient in this circumstance, and I would ask the court to impose it.

THE COURT: $10,000 total, or five and five?

MS. GREGSON: Five and five, and the J_Blond victims will divide that amount between them, pursuant to their attorneys.

I am asking the court to impose a no-contact order with Carter, who is the victim of Counts 3 and 4.

I've decided to address the court with respect to several aspects of sentencing, first starting with the sexual deviancy evaluation, which the parties received yesterday.

The quality of the evaluation is highly concerning. The report ultimately lacks the necessary data to support the conclusion that it comes to.

Of course, one of the biggest concerns is the brevity of the report. It is two pages. It is missing all of the markers commonly seen in state-certified sexual deviancy evaluations, evaluations I've seen thousands of, due to my 15 years as a special-involved prosecutor for King County.

It also does not --

THE COURT: Counsel, is this evaluator known to you?

1    MS. GREGSON:  I have rarely seen Mr. Whitehill --

2  Dr. Whitehill.  I've often seen Vince Gollogly, who is his

3  partner.  More often I see Northwest Treatment Associates; I

4  see Chris Covell; I see, you know, more commonly associated

5  deviancy providers that this court has before it, which is

6  the same group that comes before King County.

7    THE COURT:  So are you sure this person writing this

8  report is actually certified to do so?

9    MS. GREGSON:  I believe it is subject to -- his

10  signature line indicates he is a state-certified sexual

11  deviancy provider in Washington State.

12    THE COURT:  Okay.

13    MS. GREGSON:  I'd like to point out that, you know,

14  going through this evaluation and comparing it to the ones

15  that we typically see, which are divided in a very systematic

16  way, what struck me first are the data points.  There were

17  only four things that Mr. Whitehill considers, and that is

18  woefully inadequate.

19    He looked at the plea agreement; the letter from the

20  attorney in Colorado, in which he pled here to these charges

21  and the government recommended ten years; that they would not

22  pursue prosecution; the superseding indictment, which is

23  rather barebones; and the transcript of the defendant's 2014

24  interview with the Seattle Police Department in which the

25  defendant discusses owning several of the accounts, appears

to determine where this is headed, and terminates the interview.  So it's a very meatless interview, if you will.

Typically an evaluator, such as Dr. Whitehill, will be provided with the entire set of discovery, including the recommendation for determination of probable cause, which is akin to a complaint, which is a summary of the investigation, the evidence, and the witnesses.

But Dr. Whitehill didn't have that document.  He didn't have any of the documents, which leads the state to ask the court to find his conclusions of no risk to the community, essentially, or negligible to the community, is not persuasive.

THE COURT:  Counsel, let me ask you this:  Let's assume I agree with you, for the purposes of argument, that this is woefully inadequate.

You bargained for an evaluation.  You didn't bargain for the quality of the evaluation.  So are you still bound by your 120 months?

MS. GREGSON:  I am.  I believe I am.  I think that's equitable and that's the correct thing to do.  The defendant did go through the steps.  He certainly does not control Dr. Whitehill's ultimate product.  I assume they were under time constraints of their own, and they will likely address that with the court.  But I do feel that I am bound by that, and I want to honor that agreement.

1    I do want the court to know that I feel that, had

2  Dr. Whitehill had the information that, typically, deviancy

3  evaluators possess, he would be able to have challenged the

4  defendant on some of the information that was provided, and

5  that corresponds to the defendant's apology letter.

6    So, for example, the defendant -- Dr. Whitehill would have

7  been able to challenge this notion that the nearly 4,000

8  files of child pornography confiscated from the Dropbox

9  account were not, in fact, his own.  He would have seen the

10  Dropbox analysis and known that the six that were uploaded on

11  the day of the cyber tip, which got this whole ball rolling,

12  were just six on one day.  There were still 3,000-plus other

13  images that had been neatly organized into files by type.

14  They had been moved, they had been deleted, they had been

15  shuffled around over the course of the nearly two weeks that

16  the account was open.

17    And so he could have challenged Mr. Bridges, which may

18  have affected his assessment of risk to the community or

19  whether or not he was amenable to treatment.

20    I would also point out that Dr. Whitehill would have been

21  able to see that the Dropbox log-in accounts correspond to

22  the defendant's travel across Europe, which Amazon employment

23  records confirm he had been over there for the purpose of

24  business.  So he would see that the person logging in to the

25  account, the Dropbox, was a person with the same location as

1  the defendant.  So, again, he would have been able to

2  challenge this notion that that child pornography was not, in

3  fact, the defendant's.

4     He could have addressed the defendant's personal history.

5  He could have addressed the detailed psychological testing

6  section.  Because as we know, self-report alone is not

7  sufficient.  There needs to be medical history, mental

8  history, collateral interviews, sexual history, a psych test

9  analysis and how those tests impacted his ultimate

10  conclusions.

11     Had he been provided with and reviewed the discovery, he

12  would have challenged the position the defendant has taken

13  with respect to Carter as it being episodic abuse.  He could

14  have reviewed the Homeland Investigation reports or the

15  statements from the two men out of New York who met the

16  defendant when they were teenagers and had sexual

17  relationships with him.  He could have reviewed the

18  individual from Chicago, whose images we found.  He could

19  have seen that, up until April of 2014, the defendant had

20  been communicating with a person who was pretending to be a

21  15-year-old boy in Issaquah in a very concerning manner.

22     All of that information was in the discovery, none of

23  which Dr. Whitehill conducted, and none of which he could

24  have considered in coming to his ultimate conclusion that

25  Mr. Bridge is not a risk to re-offend and is amenable to

1  treatment.

2      I also want to point out one other thing.  Dr. Whitehill

3  mistakenly asserts that had Mr. Bridges resolved this case in

4  King County, he would have been eligible for a Special Sex

5  Offender Sentencing Alternative, and that is flatly untrue.

6  That is a specialized sentence that requires not only an

7  established relationship with a victim, and depiction of

8  crimes pursuant to Division 1 -- we call them depiction

9  crimes -- but child pornography crimes are not eligible for

10  Special Sex Offender Alternatives because there is no

11  established relationship with any of the children that are

12  contained in those images.

13      I'd next like to address the defendant's apology letter.

14  I think, reviewing it, it seems to me that the defendant has

15  couched this calculated seduction of a confused 14-year-old

16  boy as a regrettable adult relationship.  I would submit to

17  the court that Carter just happened to be the individual for

18  whom the defendant was caught.  I would ask the court to

19  reject the defendant's portrayal that what he did to Carter

20  was, I believe, a 25-month-long relationship rather than a

21  two-plus year enticement and exploitation of a child.

22      And I would encourage the court to consider, if a

23  36-year-old man suggested or attempted to describe that his

24  two-plus-year sexually explicit liaison was with a

25  14-year-old girl in this manner, how well that would be

1    received.  I don't think it matters that Carter is a boy.  It

2    certainly doesn't matter what the sexual orientation is.

3    It's just flat wrong.

4        I'm asking the court to consider the crimes before you.

5    While clearly it is the possession of child pornography that

6    is the driving force, the proverbial driving the train, in

7    terms of the guidelines, it is the exploitation and sexual

8    abuse of Carter that really is the reason the defendant

9    deserves the ten years' imprisonment.

10       Unlike the two other defendants who were sentenced for

11   traveling in the past year in the Western District of

12   Washington, both of whom receive 70 and 84 months,

13   respectively, neither committed sex acts against a child.

14   The defendant did.

15       Carter's grandmother prepared a letter for the court, and

16   she does a far better job of explaining the relationship and

17   the effect that it had on Carter, and I would like to read a

18   portion of it.

19       "When the defendant entered C's life, he was 14 years old,

20   a young boy confused and looking for answers.  Greg Bridges

21   made contact with C through the Internet and started a

22   relationship, something C so desperately wanted, to feel

23   loved and accepted for who he was.  Bridges did not stop

24   there.

25       "Knowing C was 14, Bridges sent gifts, something C's dad

never did.  Bridges traveled to Colorado, something C's dad
did not do.  Bridges offered C a relationship, something C
did not have with his dad.  Bridges was C's dad's age,
filling the need for a father in his life.  But all of this
came with a price.

"Bridges sexually abused C.  Bridges' actions are
reprehensible and unforgivable.

"After testifying in November of 2015, C became distant,
got more migraines, became ill, missed lots of school, failed
his classes, did not complete his senior year of high school,
did not graduate."

The defendant's sexual abuse of Carter had both physically
and mentally devastated effects upon Carter, forever shaping
the way that he feels about the world, about the people in
the world, and most heartbreakingly, about how he feels about
himself.

The defendant avoided prosecution in Colorado, but he
should not escape justice for what he has done.  And I am
asking the court to impose ten years and would note the
defendant has foregone his -- waived his right to appeal
pursuant to the plea negotiations.

Does the court have any questions for me?

THE COURT:  I do.  Let's go back to the guidelines.
It's your position that the guideline needs to be read
that if there is sexual contact, it does not matter if it is

1  commercial or not?

2          MS. GREGSON:  That is my read of Prong A.

3          THE COURT:  Okay.  Let's talk about the second prong:

4  Commercial.

5      Commercial doesn't necessarily have to mean for money.

6  There were gifts exchanged here.  Does that also qualify?

7          MS. GREGSON:  That would qualify.  The telephone in

8  particular, yes.  The travel, the dinners, the hotels, the

9  weekends.

10          THE COURT:  So on either side of the issue, you

11  believe it qualifies?

12          MS. GREGSON:  I do, Your Honor.

13          THE COURT:  Okay.  Thank you.  Counsel?

14          MR. PATE:  Thank you, Your Honor, and good morning.

15          THE COURT:  Good morning.

16          MR. PATE:  I'd like to start, if I may, on the

17  guideline issue that remains unresolved.

18      We did file an objection to PSR paragraphs 40 and 49

19  relating to the application of 2G1.3(b)(4) to this case.  And

20  as the court has just heard from the government and, no

21  doubt, reviewed the section independently, there is a

22  two-level enhancement that will apply if the offense conduct

23  is being evaluated under this particular section, and it

24  involves the commission of a sex act, in Subsection A, or,

25  specifically for crimes evaluated under Subsection A3 and A4,

1  involves a commercial sex act.

2      So I understand, I think, the court's focus, but just

3  initially, it is my interpretation of this subsection that

4  there is absolutely no reason to have a Subsection B if any

5  sex act is going to result in a two-level enhancement for any

6  offense that's evaluated under 2G1.3.

7      It appears, although they're certainly poorly drafted,

8  that the Sentencing Commission is trying to distinguish

9  from -- between the crimes that would fall under A1 and 2

10  versus A3 and 4, which start out with a lower base offense

11  level.

12      If you have the lower base offense level, to get this

13  additional two levels, you have to show that there is a

14  commercial sex act, not just a sex act.

15      If that was not the purpose, there's absolutely no reason

16  to have a Subsection B, because --

17          THE COURT:  So is it a commercial sex act or a

18  commercial sex crime?

19          MR. PATE:  I believe it says a "commercial sex act."

20  That is the language of the actual guideline section.

21          THE COURT:  Can that be interpreted as an offer

22  without a sexual contact?  In other words, prostitution is

23  not necessarily the act.  The prostitution is making the

24  agreement.

25          MR. PATE:  Right, Your Honor.

1    I believe the application of this particular subsection

2  would require some sexual contact.  Whether that definition

3  would include more than intercourse, I think it would, but I

4  do believe there has to be some physical, sexual contact for

5  it to fall under this subsection.

6    Now, as the court seemed to point out during the

7  government's presentation, a commercial sex act does not

8  necessarily have to be prostitution, for example, where money

9  is exchanged for sex or where there is a profit motive

10  involved.

11    And I do think that the case law would also allow an

12  enhancement if there was a clear connection between

13  compensation, money, benefits, gifts, and the sex act itself,

14  the type of exchange that we would see in a prostitution

15  situation.

16    While there was a phone that was provided to Carter at

17  some point during the course of this offense, I don't think

18  the government has established, by a preponderance of the

19  evidence, or really by any evidence, that that phone was in

20  exchange for a sex act.

21    In fact, we don't even know the timing of that phone and

22  how it may have applied to the actual offense conduct in this

23  case.

24        THE COURT:  Well, there were other things beside the

25  phone:  The dinners, the weekends out, the benefits of

1  engaging in entertainment.  I mean, all of those things can

2  be exchanged for sex.

3         MR. PATE:  Can be, Your Honor, but I think that is

4  the operative word.  I think what is missing here is a proven

5  connection between those benefits and the sexual contact.

6         THE COURT:  Well, what other connection is there

7  here?  In other words, you know, we have a sex act with

8  someone who cannot consent, and therefore we've got -- what

9  other purpose is there to that sex act?

10         MR. PATE:  Well, Your Honor, while certainly Carter

11  cannot legally consent to the sex act, I don't think that

12  necessarily means the only reason he did it was to get a

13  phone or to get a trip or a meal.

14         THE COURT:  Well, it doesn't have to be his point of

15  view.  It has to be your client's point of view.

16    What other reason was he giving these things other than in

17  exchange for sex?

18         MR. PATE:  Your Honor, I believe it's speculation.  I

19  think he certainly wanted a close relationship with Carter.

20  I don't know that the government has established that the

21  primary purpose of the relationship was sexual.  I don't

22  believe that's been presented in the evidence or in the

23  unobjected part of the PSR.

24         THE COURT:  Then you're saying that there is some

25  other reason why this relationship existed other than sex?

1    MR. PATE:  I do believe that is true, I do.

2    THE COURT:  Okay.

3    MR. PATE:  But I think for the court, for purposes of

4  this guideline section, to find that it is a commercial sex

5  act -- if you get to that point, and you may determine simply

6  that I don't have to find that.  It was a sex act, and

7  therefore this two-level enhancement applies.

8    But I think if the court interprets it the way that I have

9  suggested, you would need to show a specific nexus between

10  whatever benefit, compensation, or money was being provided

11  and the sexual contact.

12    I looked for some cases, and I could not find a single

13  case, in this circuit or other circuits, where a two-level

14  increase was given.  When the case fell under Subsection A3

15  or A4, it did not involve a clear commercial sex act.

16    Now, none of those cases flat out say you can't apply it

17  if you only have a sex act.  But it was -- those cases were

18  all reviewed for other reasons, primarily whether there was

19  actually a commercial sex act or not.

20    But I could not find a case.  And I think if the

21  government had found a case, Your Honor would have heard

22  about it, where there was the application of this two-level

23  enhancement, where you just had a sex act without the

24  commercial aspect to it.

25    THE COURT:  Well, let's assume that you don't need

1    the second section.  Is there any other provision in the

2    guidelines that when you have a hands-on offense, that there

3    is an increase?

4         MR. PATE:  I'm trying to go through the guidelines in

5    my mind.  I certainly know for -- there's a statutory

6    increase, and obviously there is this increase.  I'm trying

7    to think of another guideline section, and I'm not able to

8    cite one.

9         THE COURT:  Well, let's assume that the second prong

10   is wrong --

11        MR. PATE:  Okay.

12        THE COURT:  -- as you argue.  Isn't it certainly

13   reasonable that the Sentencing Guideline Commission wanted to

14   up the ante when you have hands-on contact?

15        MR. PATE:  No question.

16        THE COURT:  Okay.  So even if you sever the second

17   portion, doesn't it make sense that the first portion is set?

18        MR. PATE:  It would, but then the second portion

19   would never be in the guidelines.  If you're just going to

20   have a sex act qualify for the two-level enhancement, why

21   then qualify that with the need for a commercial aspect if it

22   involves -- when the offenses are to be treated equal?

23     It's admittedly poorly drafted, and they give us no help

24   in the application notes as to when a commercial sex is

25   required and when it's not, other than to clearly say if it

1  falls under A3 or 4, that's when you have to look for the

2  commercial aspect to the sexual contact.

3      I wish I had cases that said just that, and if I did I

4  would cite them to the court, but I do not.  But I don't

5  think the government has, either, and so it's one of these

6  issues -- I don't think it comes up often.  Because if you

7  read this just by the plain language, you're not going to

8  seek that enhancement under A3 or 4, but you have some

9  commercial aspects to it.

10      And perhaps if the government had looked at it that way,

11  then you would have been presented with some clear facts that

12  could tie compensation, benefits, gifts, that sort of thing,

13  to sexual contact by time, by conversations, by exchange.  I

14  just think, on the record that we have now, we don't have

15  that evidence, and it's certainly not by a preponderance.

16          THE COURT:  Well, counsel, let's talk about the

17  circumstantial evidence here.

18          MR. PATE:  Yes, Your Honor.

19          THE COURT:  If someone wants a constructive

20  relationship with a child, one would think that one would

21  look for that child in a way that develops naturally.

22      This child was met on the Internet after someone goes out

23  and seeks him out.  Doesn't that alone indicate that the

24  purpose of this contact was sexual?  It's not because

25  somebody wants to be a big brother or wants to be, you know,

1  somehow altruistic.

2          MR. PATE:  I think that's certainly a fair

3  assumption.  The court did touch on what we have is a factual

4  objection and, perhaps, maybe a factual clarification on how

5  Mr. Bridges actually met Carter in this case.

6      We know from the PSR that Carter now maintains they met

7  through Facebook and that he had a profile that clearly

8  indicated his age was 14.

9      I went back through the discovery, and in Carter's second

10  interview -- in his first interview he makes no statement at

11  all.  In his second interview, the agent's note clearly

12  states that Carter said they met on a social application or

13  social website, possibly Facebook.  Carter then speculated

14  that, "Maybe it was one of these gay teen sites I was

15  participating in."

16      There was certainly no assurance or any type of clear

17  statement from Carter back in the beginning of this

18  investigation that that's how they met.  That kind of

19  developed as the investigation went along, to where,

20  apparently, now he's convinced that it was on Facebook.  I

21  don't think that is the case.  And Mr. Bridges has been clear

22  from the beginning that they met on what is an adult gay

23  dating site.

24      So to Your Honor's point, yes, perhaps that would suggest

25  some type of relationship, perhaps a sexual relationship.

1    But I don't think it is suggestive that is the way that they

2    met; that Mr. Bridges was looking to find someone under the

3    age of consent to then entice with these other benefits to

4    have a sexual relationship.

5        Our objection to the multiple-count enhancement basically

6    only makes sense if the court sustains our objection to this

7    particular guideline application.  If the court overrules

8    that objection, then the grouping rules, as they were applied

9    in this case, are accurate.

10        If the court sustains our objection, then we think there

11   should be one less point added and that the ultimate total

12   offense level would be 35, and then for a three-level

13   variance, since the evaluation has been done, we think the

14   court would end up at a 32.

15        If I may now switch to the 3553(a) factors.

16        As the court has indicated, we did provide a sentencing

17   memorandum with a number of character letters provided to the

18   court.

19        As I'm sure the court can see, many of those people are

20   here today in support of Mr. Bridges.

21        And the one thing that I noted as I went through these

22   letters is, you can see, whether this is good or bad, that

23   Mr. Bridges has always had a very strong, supportive network

24   of family and close friends that have been there for him in

25   good times, difficult times, and even times like today,

which, really, I can't imagine a more difficult situation for
them to be here in support, and they are here.

If you read those letters -- and I trust the court has --
you also see several elements coming through again and again.
He's been committed both to his family and his community.
He's made significant professional accomplishments in the
workplace, here with Amazon, and as he did for many years.

He has a relationship, a faith-based relationship, perhaps
renewed and even stronger now, from what I read from some of
these letters, that has helped sustain him and his family
during this difficult case.

I think the point of all that and the significance of all
that for today's proceedings is, this is not somebody that,
once the sentence imposed is completed, is going to go out
into the world without anything other than federal supervised
release.  He has a network of people willing to help him,
able to help him, and who have shown through what they've
done in the past, are committed to help him.

Many of these people, Your Honor, have traveled great
distances to be here.  His parents have flown state to state
all during the time this case was pending.  There was the
issue of retaining me.  Initially, there was concern about
communication with prior counsel.  So instead of simply
allowing that to go forward, the family intervened, and,
again, took whatever steps they could possibly take to try

and do what's best for Greg and to try to help and support
him.

I think the letters also speak to an individual who, once
corrected, can take steps to improve and follow the rules.
And the court mentioned that you reviewed the performance
evaluation, or at least how he's done on pretrial release,
and it's been exemplary.  I don't know how else to summarize
that or analyze that, but I believe the officer is here
today.  And the things that I've read in that report that are
significant is what he's done as far as being committed to
the treatment, the therapy, so much so that he's, apparently,
an important part of the group.  He helps others within the
group.  I believe the words are "showing great compassion
and care and understanding" for the other people that are
going through the same type of treatment and evaluation that
Mr. Bridges has.

So he's not someone they had to drag to the meetings, who
is reluctant to participate, who is still in denial about all
of this, is defensive about all this.  He jumped in with both
feet.

THE COURT:  Counsel, what am I to make of this letter
where he basically says he is not a pedophile?

MR. PATE:  I think you can accept it at face value.
I think -- and I know in the state system we differentiate a
little bit between levels of offense for the age of the

1　victim in the case.

2　　I think there is a clinical difference between an

3　individual who is sexually attracted to an eight-year-old or

4　a nine-year-old, and someone who is sexually attracted to an

5　underage yet, perhaps, sexually mature 14- or 15-year-old.

6　　I want to talk about the evaluation, but I think, in

7　Mr. Bridge's mind, he's not interested in young kids.

8　　　　THE COURT:  Well, then what is he doing with

9　thousands of images of little boys?

10　　　　MR. PATE:  That's an excellent question, and I

11　believe if this case were solely about the images in the

12　Dropbox account, perhaps we would have had a different

13　conclusion to the case, or, at least, perhaps a different

14　resolution.

15　　The facts that are in the PSR are somewhat limited about

16　that part of the offense.  What I've been able to gather

17　through the discovery -- and I'm certain the government will

18　correct me if they believe I'm saying something

19　inaccurately -- is that a number of images were uploaded to

20　the Dropbox account.  And as the court probably knows, that's

21　a cloud storage system.  It is not physically present, at

22　least not in the Dropbox account, necessarily, on

23　Mr. Bridge's devices, but it's uploaded to a cloud account.

24　　On one day about three weeks after this Dropbox account

25　was opened, they get search warrants, they go out and look,

and they find a considerable amount of child pornography in this Dropbox account.  We know that Mr. Bridges accessed that.  No question about it.  What we don't know is, was he looking at this stuff to see what it is and then getting rid of it?  Is he looking at this stuff on a daily basis?  Is he trying to maintain a collection of it?  Standing alone, does he even have possession of it once it's in the cloud storage?

None of those issues needed to be addressed because Mr. Bridges has always consistently said, "I knew it got there, I didn't really want it, but I did possess it through that period of time."

So we didn't do a full forensic evaluation of the evidence.  Although we talked about doing that, he simply did not want to contest it.

I think it is significant, yes, he did get a brand-new laptop computer once Dropbox shut down that account.  The agent and, perhaps, the government would suggest, well, that's evidence of criminal intent.  I think it is the opposite.  I think if you determine that there is child pornography that you don't want somehow connected to your computer and your Dropbox account, you're going to get rid of that computer.

And significantly much later in time, when they actually did the physical search warrant of Mr. Bridges' house and they seized his active laptop, his iPad, all of these

1    electronic devices, none of those images or even similar

2    types of images were found on his devices.

3        If this is the type of individual -- and I know the court

4    has seen in the past -- that truly is interested in child

5    pornography, they collect this stuff, they treasure this

6    stuff, and they keep it with them for long periods of time.

7    We don't have evidence of that in this case.

8        What we do have and what is most concerning -- and I do

9    agree with Ms. Gregson on this -- is the fact that he had a

10   clearly illegal relationship with an individual in Colorado.

11       We submitted an evaluation to this court literally

12   yesterday.  There are a number of reasons for that, some of

13   which I can take responsibility for, not anticipating that

14   the process would take so much time as it did.

15       Mr. Whitehill was provided access to everything he wanted

16   to look at, but he was also told that we had to have this

17   report done by tomorrow at the absolute latest.

18       I communicated with his office over the past week about

19   setting up this final interview.  The process took over ten

20   hours of test-taking, and then approximately three hours of a

21   personal interview with Dr. Whitehill.

22       Obviously, we cannot control what Dr. Whitehill puts in

23   his report.  I did not want to have any influence on that

24   whatsoever.  He did offer to me, and as we will now offer to

25   the court, that he could provide a more detailed report if he

1    had the time to do that.  I'm not suggesting that an

2    additional week would have made a big difference, but as the

3    court does know, I should point out that we did have

4    sentencing set a week in advance of today.  And had

5    Dr. Whitehill had that additional time, could it have made a

6    difference?  It's certainly possible.

7        I do believe I personally pointed out to the courtroom

8    deputy that we were in the process of that, and additional

9    time would certainly be beneficial.

10       I thought, based on the findings, even though you don't

11   see enough detail as to how he reached those conclusions, I

12   think the findings are significant, so I think the evaluation

13   is significant.  But I don't want to suggest to the court

14   that there couldn't be more; that the detail that the

15   government is asking for would not be available if

16   Dr. Whitehill had not had more time than he did in this case.

17            THE COURT:  Well, counsel, what I'm confused about is

18   that this case started a long time ago.

19            MR. PATE:  It did.

20            THE COURT:  He got charged in King County.  I don't

21   know exactly what happened in Colorado.  But he got charged

22   in King County in 2004, and why there is a race to get -- in

23   2016, on September 1st, there's a race to have an evaluation

24   done, I mean, what that tells me is there was somebody who

25   was resistant to having an evaluation done for years.

MR. PATE:  If Your Honor recalls the pleadings that
we filed in this case, there was a significant concern that
both the status of the case, the plea negotiations, while
they were being communicated to counsel, they were not being
communicated to Mr. Bridges.

I filed a motion specifically to try to get into that, the
factual circumstances of that, because Mr. Bridges had
indicated to me he was interested in this plea agreement that
the government had previously offered him.  He said he didn't
know about it.

I had great difficulty contacting prior counsel.  I
finally talked to him on one occasion.  I could not determine
whether, as the government seems to suggest, it was
Mr. Bridge's reluctance to do this, or simply counsel's
inability or unwillingness to communicate what needed to be
done in the case to Mr. Bridges.  I don't know.  I wasn't
involved in the case at that time.

I do know that after I became involved, the focus was
immediately placed on how he can resolve the case, how he can
accept responsibility, and how we can do a proper evaluation
and seek treatment.

I understand the court's concern, and I don't know --
frankly, I don't know what happened before I became involved
in the case.

I also don't know, necessarily, why the process would have

1   taken as long as it did.  I do know there was a polygraph

2   done -- that was referenced in the evaluation -- where he was

3   asked about other sexual contact with minors that had not

4   been disclosed, and he was not deceptive, according to the

5   examiner.  There was no deception in the case.  I know that

6   was done prior to the sit-down with Dr. Whitehill.

7        These things clearly take some time, and I think with more

8   time to prepare the report, perhaps the court would have more

9   than we see in this, I guess, two-page or less -- two-page

10  document that we have before us.

11       But he is licensed and he does make these conclusions,

12  even if he didn't put all his work in the document, and the

13  conclusions are that Mr. Bridges presents a negligible risk

14  of re-offense, the lowest risk of the re-offense category,

15  according to Dr. Whitehill.

16       And, again, what I think is important and what I think the

17  court has seen on pretrial supervision is a willingness,

18  indeed, an eagerness to seek treatment, to participate in

19  treatment, and to change his behavior.  And I think, in my

20  experience and, perhaps, the court's as well, that's the

21  secret to people getting better versus people who don't,

22  people that are a risk to the community versus people who

23  aren't, and it seems that Mr. Bridges falls on the right side

24  of that question.

25       I do not practice in the state of Washington, and so

1    Dr. Whitehill's suggestion that Mr. Bridges would be an ideal

2    candidate for the state program, I can't really comment on

3    that.  I heard Ms. Gregson's comment that there are other

4    elements that need to be met.  Perhaps that's true.

5        What I do know is, if Dr. Whitehill has been doing this,

6    and Ms. Gregson concedes that he has, he's seen people that

7    have gone through that program, and he believes Mr. Bridges

8    is like one of those people that would be successful in a

9    similar program.

10           THE COURT:  Mr. Pate, we're not in state court.

11           MR. PATE:  We're not in state court.

12           THE COURT:  We don't have that.  That's not the way

13    it's been charged.  We don't have a similar statute.  So that

14    argument is neither here nor there.  It's a little bit, so

15    what?

16           MR. PATE:  You know, Your Honor, I didn't make the

17    argument.  I simply cited to Dr. Whitehill's suggestion, for

18    what it's worth.

19           THE COURT:  Okay.  Well, here's the problem that I

20    see:  I'm not familiar with Dr. Whitehill.  I'm certainly

21    familiar with -- I mean, I've read if not thousands,

22    certainly hundreds of these evaluations, and this is the

23    worst one I've ever seen in terms of its clarity, in terms of

24    its depth, and in terms of what else I see from the other

25    facts that are put before me.

The government tells me there were other victims, that they were interviewed. I get letters from friends who clearly lead me to believe that there's been a minimization of the actions here.

I get letters -- you know, one of the problems with getting so many letters from friends and family is that it becomes, over time, a very clear picture that somebody is not being honest with friends and family, and that they're leading a very double life.

I appreciate the fact that there are people willing to stick by him, but it does make me question whether he's been honest with those people, because the things they write, they don't seem to have a depth of understanding of what the crime is.

MR. PATE: I certainly appreciate that, Your Honor, and I've seen it in my practice. Many times -- and I'm sure the court recognizes this -- that defensiveness, that minimization comes from the family.

THE COURT: Well, it may very well be because these are difficult issues for people to acknowledge, particularly when it's somebody they love or somebody that has performed well in other aspects of their life. But it's not unusual that the support system hadn't a clue, nor do they have an appreciation of the depth of the harm that's been perpetrated.

1    So -- and then when I get a letter from a defendant who

2  tells me that he's not a pedophile, when, in fact, he has

3  just pled to a hands-on act with a child, it is really

4  difficult.

5    So let's turn to what your recommendation is, because

6  you're going to have to convince me that it's not absolutely

7  out of the range.

8      MR. PATE:  If Your Honor looks at 3553, and I know

9  you know it very well, we're talking about, for purposes of

10  sentencing and the use of government resources, what's best

11  for the defendant, what's best for the community, what makes

12  sense for deterrence, all of those factors together.

13    I've heard judges -- and perhaps Your Honor thinks the

14  same way -- boil it down into really a couple of things.

15  One, does the defendant get it?  And I think Your Honor

16  talking about minimization, that's obviously a factor that's

17  important.  Does he recognize the severity and illegality of

18  his conduct?  And number two, is he going to do it again?  Is

19  he a danger to the community?  Is he a threat to himself, to

20  other people?  What do I need to do to prevent another

21  offense from this defendant?

22    I understand the court's concern about whether the

23  definition of pedophile applies in his mind or not, but I

24  think, if we look not just at what he said but what he'd

25  done, there should be a little more comfort that he does get

it.

I think his supervising probation officer would be telling the court that he's been reluctant to participate in treatment, he's been obstructive, he's -- and I thought there were actually comments in there about he being candid and sharing his thoughts about the process with the officer. I don't think you would see that if he was really in denial or did not get it.

I think as far as is he going to do it again, we look to the evaluation and what he's done for the past year while he's been on federal supervised -- or pretrial release. His conditions have been lessened at the request of Probation because he's done so well in following the rules, and not just participating in the counseling and the therapy, but simply doing the stuff you've got to do while on pretrial release: Be home when you're supposed to and follow all the other guidelines and rules.

I think that shows, coupled with the evaluation -- I understand the court's concern with it. I wish it were longer, but I had no time to make those suggestions when it came to me.

I think if you look at those two factors, the court should be satisfied that he does get it. And if he doesn't get it now, after a year in custody he will most certainly get it. And the ability to come back and do the right thing, correct

his behavior, work on his treatment, and follow the rules,

he's got a long period of supervised release hanging over his

head, and if he slips up, he goes to prison for a very long

period of time.

So I think -- and the reason I suggested to the court that

that would be reasonable and an effective use of taxpayer

resources is, I don't think locking him up for ten years is

going to make No. 1 any clearer, and perhaps, if anything,

reduce No. 2 when he comes out a decade from now without the

same support network, without the same employment prospects,

and perhaps without the same commitment to treatment and to

try and make things better for himself and everyone else.

If the court is really concerned about the brevity of this

report and wants more, I simply offer that to the court.  If

you can give us additional time, I can go back to him and

say, "Show your work."  I can ask him to do that.  We do have

that available to us.

There are two other points, Your Honor, that I did want to

address.

In the proposed J&C, there was a special condition of

probation.  And we have no objection to the vast majority of

them.  But the one -- and it's almost like a final sentence.

I think I put in my memo -- it's No. 9 -- but it's actually

No. 7, where, in addition to all the monitoring and things of

that nature, that he not be allowed to access the Internet

1  during the time of his supervision.

2     I think in the days when we just used the Internet to

3  actually communicate with people, and, you know, downloaded

4  stuff from the Web, that made sense, but today we talk about

5  Dropbox.  I mean, most of my office files are on Dropbox.  We

6  use cloud-based storage systems, and if you can't access the

7  Internet, you can't get to the company files.  If you can't

8  access the Internet, you can't communicate with other people

9  in the company by email.  You can't participate in networks,

10  all of which have legitimate businesses purposes.  And given

11  all of the other restrictions on his Internet use or his

12  computer use, I don't think that one is necessary to

13  accomplish the sentencing purposes of 3553.

14         THE COURT:  Well, I think you may have misread the

15  paragraph, because it basically says you can't do this

16  without permission of the probation officer, and we have

17  protocols in place so that people can go to work and people

18  can use the computer, but they have to install special

19  programs.

20         MR. PATE:  If that's all, then that's fine.  It's

21  just that sentence, standing alone, stood out to me as saying

22  you can't get on the Internet for any purpose.

23         THE COURT:  And I'll confirm that with Probation.

24         MR. PATE:  Thank you, Your Honor.

25     As far as restitution, I spoke to Mr. Bridges about this.

I don't know how we determine what is a reasonable amount.
There's no question these people have been victimized.  I
don't think primarily by Mr. Bridges.  I think the evidence
in this case -- obviously, he's not producing the child
pornography, he's not selling the child pornography.  It
doesn't even appear he was sharing or exchanging the child
pornography.

So while there is definitely some victimization and the
law mandates restitution in these cases, it's hard for us to
suggest to the court that these people don't deserve what
they're asking for.

But in considering how much to apportion to someone like
Mr. Bridges, I think the court should just bear in mind that
there is certainly a lot of other people out there who were
primarily responsible for the abuse of these victims, more so
than Mr. Bridges.

THE COURT:  Will there be a civil suit brought by
C.J.?  Because he apparently hasn't been part of the
negotiations here.

MR. PATE:  It's certainly possible.  I mean, there's
nothing in the plea agreement or anything that we've paid or
even in the court's order that would prevent that.  That's
certainly a possibility.

And finally, Your Honor, we did make the recommendation in
the sentencing memorandum that if the court could recommend

1   to the Bureau of Prisons, whatever custodial sentence the

2   court imposes, that Mr. Bridges be allowed to serve it at FCI

3   Lompoc, which is, I believe, a facility that would meet the

4   security classification within the -- whatever the court is

5   going to sentence him to.

6       I also know from anecdotal evidence that other people with

7   similar offenses have gone there and seem to have whatever is

8   needed for their particular crime to perform well within the

9   system.  So I would simply make -- request the court make

10  that request, understanding, of course, the court cannot

11  determine what the BOP does at the end of the day.

12          THE COURT:  Well, is Lompoc one of the places that

13  offers the specialized programs?

14          MR. PATE:  I don't think it offers a residential sex

15  offender treatment program.  In fact, I think -- maybe

16  probation would know better than I -- there is one or two

17  places in the country that offer that program.

18      I do know there is mental health counseling available at

19  that FCI.  I think, of course, the BOP is going to make an

20  independent determination, based on the PSR and the court's

21  order, where he goes.  But just based on the fact that people

22  from this district in similar cases have gone there,

23  Mr. Bridges requested I make this recommendation to the

24  court.

25          THE COURT:  Counsel, I'm very reluctant, with sex

offenders, to make a recommendation, because sex offenders often need protection while they're in custody, and I don't like to second guess where BOP should send them, because I'm not interesting in having them harmed.

MR. PATE:  Of course.

THE COURT:  So I'm really reluctant to grant that request unless I know that that is a specific place where sex offenders are going to get treatment and where they're going to be safe.

MR. PATE:  I cannot make that assurance to you. Thank you.

THE COURT:  Thank you.

MR. PATE:  And Your Honor, I do want to point out two things.  Although all of the people that came to support Mr. Bridges wanted to speak to the court, I would ask the court's permission, Mr. Jim Bridges, his father, who really would like to say a few words, if the court would permit that.

THE COURT:  Of course.

MR. PATE:  Can Mr. Bridges come to the podium, or would you like him sworn?

THE COURT:  No.  He can go to the podium.

Good morning, sir.

THE DEFENDANT'S FATHER:  Good morning, Your Honor. My name is Jim Bridges.  I'm the father of Greg, my only

child.

Greg and I have a very close relationship, a loving relationship, an honest relationship. And over the course of the past year and a half, we have obviously discussed his plight in detail, to the extent we could, and I have seen him agonize over what he has done. He is truly remorseful for what he has done. He regrets it deeply and has agonized over it.

During that two years, I've seen my son mature a great deal, under the circumstances, particularly quick. And I can assure you that he is a smart man who can and has learned, and he would never, ever consider these type of acts again. They will never happen in his future.

Thank you for the opportunity to speak to you.

THE COURT: Thank you, sir. All right. I'd like to hear from Probation, please.

THE PROBATION OFFICER: Thank you, Your Honor. I think I'll first address -- I'll address our application of the guidelines.

As the government pointed out, we think it is appropriately applied under (A) of 2G1.3(b)(4). I don't think the requirement -- I think the criteria is fulfilled under just (A,) the first portion for a sex act or sexual conduct. So we believe that the guidelines as we apply them -- the government's concurred -- are accurate.

1   As far as a life term of supervised release, given the

2   limited nature of the evaluation that was submitted, it's

3   difficult to make an assessment that it should be lower than

4   life.  So I would suggest to the court that it's still

5   appropriate, a life term of supervised release; however, we

6   agree, at least, with some of the conclusions that were made

7   by Dr. Whitehill.  It does appear he is amenable.  Again, we

8   don't have the supporting documentation, so we just have to

9   go on what he's saying; that maybe, perhaps, as they

10  suggested, a ten-year period of supervised release, given his

11  age, how he's done on bond, might be appropriate as well.  I

12  would defer to the court on that.

13  And the Special Condition No. 7, as Your Honor pointed

14  out, it's at the approval -- it would be at the approval --

15  and this is regarding the access to the Internet.

16  As Your Honor pointed out, it would be at the discretion

17  and approval of the probation officer and the treatment

18  provider to work with him as far as his access at his

19  employer.  So it doesn't mean that he's prohibited.  It's

20  just that there would be certain conditions in place.

21  And then I would say he has adjusted well on bond.  I, in

22  fact, supervised Greg for several months when we first

23  started out, and he was reluctant and resistant a little bit

24  at first, but I think he's evolved a little bit.

25  He's been very much involved in the Crisis Intervention

1  Program, and he is an integral member of that program.  So

2  with that, I think, you take away entirely what Dr. Whitehill

3  says, there is amenability.  He shows he can participate in a

4  group and be a member and engage.

5      Ultimately, though, this is a very serious offense.

6  There's actual victims in this case, and I still believe a

7  significant, severe term of imprisonment is appropriate.  And

8  it's for the victims, eventually.  For deterrence, I think it

9  is appropriate and reasonable.

10          THE COURT:  Okay.  Can you tell me about the

11  placement recommendations, their request for Lompoc?  I don't

12  know that that is one of the treatment facilities.

13          THE PROBATION OFFICER:  I don't think it is, Your

14  Honor.  However, I would say this:  There is several members

15  of the crisis intervention group who have gone on to Lompoc

16  for whatever reason.  And I think there is limited -- there's

17  not a full spectrum of services for treatment, but there is

18  some programming.  There is a significant, I think,

19  population -- he would know individuals there that he knows

20  from the group and feels comfortable with.

21      There's been correspondence between those group members

22  and the facilitator from our office.  So, no, it doesn't, I

23  think, have full programming, but it may be a supportive

24  environment for him, if that makes sense.

25          THE COURT:  The crisis intervention group, I'm aware,

 1   was set up to deal with specific issues of these offenders

 2   and the trigger points that they face.

 3     Do I have a problem if I allow him to remain in the

 4   community prior to reporting?

 5         THE PROBATION OFFICER:  He's done well, and I think

 6   our recommendation -- we believe that there's nothing at this

 7   point that will hurt -- or no knowledge or reason that would

 8   suggest anything other than continued supervision until he is

 9   designated.

10         THE COURT:  Okay.  Mr. Bridges, this is your

11   opportunity, if you would like to speak to me.  Would you

12   like to do that, sir?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  Okay.  Would you please come to the

15   podium?

16     Good morning.

17         THE DEFENDANT:  Good morning.  I'm sorry for the

18   mistakes that I've made that caused all of this for everyone.

19   It's not who I am.  It's not who I want to be.  It's not who

20   I will be.

21     That's all.  Thanks.

22         THE COURT:  Thank you.

23     Based upon the documents that I've reviewed and the

24   arguments that have been made, it's first my obligation to

25   calculate the guidelines, and then to fashion a sentence that

1  is appropriate for Mr. Bridges, who is here before me today,

2  using all of the sentencing statutes.

3      In this instance, the first issue for me to resolve is

4  whether there should be a two-point enhancement for the basis

5  of sexual contact, and I find that the government's

6  interpretation of the guideline is correct.  I do not believe

7  that I need to also find a commercial aspect to this case;

8  that it's satisfied when, in fact, there is a sexual contact,

9  which there has been in this instance.

10      So that leads me to the conclusion that the total offense

11  level is 36.  There is a criminal history category of one.

12  There is custody provided, then, for 188 to 235 months,

13  supervision from five years to life, a fine of $20,000 to

14  $200,000, and a special assessment of $300.

15      In this instance, what I believe is appropriate is 120

16  months.  That is a significant downward departure from the

17  guidelines, and it was bargained for and Mr. Bridges will

18  uphold his part of the bargain by having a sexual deviancy

19  evaluation done.

20      The deviancy evaluation doesn't help the court,

21  particularly, because it doesn't identify the data that was

22  used, and it appears to be at a significant variance to some

23  of the other facts.  But that's not really here nor there

24  because the downward departure is already so great based upon

25  the bargain, and I will honor the bargain here.

1    I do believe that a lifetime of supervision at this point

2  is important to order, and here is why:  There will be a

3  significant period of time of incarceration, there will be an

4  opportunity for treatment there, and there will be an

5  opportunity for a full-blown evaluation when he comes out for

6  supervision.  In other words, the man Mr. Bridges is today is

7  not the person he is going to be on supervision when he is

8  released, and so I want to see who that person is.

9    There is always the prospect that supervision is

10 shortened, particularly when people do well.  Every day we

11 sign off on supervision when people have shown that they can

12 follow the rules and that they are no longer a threat.  I

13 don't know if that's going to be the case.  That will be a

14 long time from now and for some other judge to take a look at

15 and evaluate, but I want to give them the opportunity to have

16 all the tools necessary.

17    There will be no fine.  There will be $10,000 of

18 restitution that is due and owing and that the probation

19 department can have him participate in payments of up to ten

20 percent of his annual income.

21    I do note that there is, however, money available at this

22 point in retirement accounts.  So the fee -- I don't know

23 what the plan was for the fee, or the agreement, if there was

24 any negotiations over that.

25         MS. GREGSON:  No, Your Honor.

1       THE COURT:  Okay.  There is a special assessment of

2  $300 that is due and owing.

3       Mr. Bridges, you are going to be subject to some special

4  rules, and there are some standard conditions that I want you

5  to understand.

6       While you're on supervision, you need to understand that

7  you are now a convicted felon, and you may not possess a

8  firearm.  You can't own one, you can't touch one, you can't

9  live in households with them, you can't ride in cars with

10  them.

11       You also have to participate with the collection of a DNA

12  sample.

13       I also expect that you're going to be free of controlled

14  substances.  If that is not your issue, and I don't think it

15  is, then that won't be a problem to comply with.

16       You're going to have to register as a sex offender.

17       I'm also going to order that you have no direct or

18  indirect contact with your victim, C.J.

19       You need to allow the probation department to inspect any

20  personal computer and allow them monitoring of your hardware

21  and your software.  You need to comply with the requirements

22  of U.S. Probation and the probation department's

23  computer-monitoring program.  You need to advise the

24  probation department of any software that you install.  You

25  need to also make sure that you -- your employment must be

1  approved by the probation department, and any access to

2  computers that you have there.

3      You also have to participate in any mental health program

4  that's suggested for you by the probation department.

5      You're not to possess or pursue any images that depict or

6  describe sexually-explicit conduct or material defined as

7  child pornography.

8      You're not to have any direct or indirect contact with

9  children under the age of 18 unless you're accompanied by an

10 adult who has been approved in advance by the probation

11 department.

12     You're to follow all the rules and lifestyle restrictions

13 that any care provider recommends as restrictions to you.

14     You're not to have access to places or to loiter within

15 100 feet of an area where minors are known to frequent

16 without the approval of the probation department.

17     You're going to have to commit with periodic polygraph

18 testing, and your residence needs to be approved by the

19 probation department.

20     And, finally, you have to participate in any sexual

21 deviancy evaluation that the probation department requests of

22 you while you're on supervision.

23     If there is a program that is suggested for you to

24 participate in, then I expect that you're going to make

25 progress in that program and participate in it.  Given your

1  success so far, I don't think that will be a problem for you

2  if you continue to participate in the way that you have now.

3      And, finally, you need to submit to any search of your

4  person or your property that's done in a reasonable time and

5  in a reasonable manner.

6      Do you understand the rules that I've laid out for you?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  Can you follow them?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Good.  Then I trust that you will.

11      I'm not going to make a recommendation for Lompoc.  That's

12  certainly something that you can discuss with the individuals

13  who interview you about where you should go.  And I do that

14  primarily because I want you to have the best chance to be

15  successful at any treatment that's provided, and I also want

16  you to stay safe.  So I'm going to leave that to the Bureau

17  of Prisons to decide where it is that you should go.

18      Now, the probation department is suggesting that I not

19  take you into custody today, although that is usually the

20  norm, and that I allow you to self-report when the Bureau of

21  Prisons advises where it is and when it is you need to do

22  that.  Let me explain why it is important to you.

23      Generally, the Bureau of Prisons basically says if the

24  judge can trust you, they can trust you, and so you can

25  self-report, and usually the privileges that you're allowed

1  are greater than those that can't be trusted and have to be

2  taken into custody.

3      If I allow you to self-report, do I have your promise that

4  you will show up when and where the Bureau of Prisons tells

5  you to?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Good.  Then that's what we'll do.

8      Have I left anything unattended to?

9          MS. GREGSON:  No, Your Honor.  I believe you've

10  covered everything.

11     I do have one point of clarification.

12     Would the court prefer the marshals notify Mr. Bridges, or

13  probation and pretrial services?

14         THE COURT:  It doesn't matter.  I don't care who

15  tells him where it is he needs to go.  But whoever tells him,

16  the point is, he has to go.

17         MS. GREGSON:  With the court's permission, may I hand

18  the judgment to counsel?

19         THE COURT:  Certainly.  Show it to Mr. Pate.

20         MR. PATE:  Thank you, Your Honor.  It appears

21  consistent with your order.

22         THE COURT:  Show it to probation, please.

23     Counsel, is there any reason why I shouldn't sign the

24  preliminary order of forfeiture?

25         MR. PATE:  No, Your Honor.

1      THE COURT:  Okay.  Also I'm signing the motion to

2  seal the defendant's sentencing memorandum.

3      Mr. Bridges, I've signed the judgment.  I want you to

4  listen to me carefully because there are certain rights that

5  I want to make sure you understand.

6      As part of your plea agreement with the United States, you

7  bargained away many of your appellate rights.  There are,

8  however, some rights that you have that cannot be bargained

9  away and stay with you always; for example, the right to have

10 a good lawyer at your side throughout all of these

11 proceedings.

12     If you want to appeal the sentence that I've just given

13 you, it's very important that you tell your lawyers that

14 that's what you want to do.  They have 14 days in which to

15 perfect an appeal.  They can explain to you how the Court of

16 Appeals works, and they can also talk with you about what

17 issues might be appealable.

18     If you want to appeal the sentence but you cannot afford

19 the filing fee for the Court of Appeals, you can ask me to

20 waive or do away with that fee.

21     Do you understand what I've just told you?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  Do you have any questions for me about

24 it?

25          THE DEFENDANT:  No, Your Honor.

1          THE COURT:  All right.  Is there anything else we

2     need to take care of?

3          MS. GREGSON:  No, Your Honor.  Thank you.

4          THE COURT:  Okay.  Then we will be at recess.

5               (THE PROCEEDINGS CONCLUDED.)

# C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 22nd day of October 2016.

/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter